### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KIERA MARTIN, | : | |
| *Plaintiff* | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| CHESTER CHARTER SCHOLARS | : | |
| ACADEMY CHARTER SCHOOL, | : | No. 20-2067 |
| *Defendant* | : | |

### M E M O R A N D U M

PRATTER, J.                                              DECEMBER 21, 2021

Each year, Kiera Martin prepared the annual budget report for Chester Charter's after-school program. But in 2019, she fell ill, and took a three-month leave under the Family and Medical Leave Act. In her absence, others at Chester Charter did not work on the report, even though the deadline loomed. So Ms. Martin requested an extension from the Pennsylvania Department of Education and finished the report once she returned from her leave. Her final report contained mistakes, as it had in years past, and Ms. Martin made revisions to fix those mistakes, but not in time to stop the Department from temporarily shutting down the after-school program. Pointing to the shutdown, Chester Charter fired Ms. Martin.

Ms. Martin sued, claiming that Chester Charter actually fired her because her supervisors were annoyed that she took medical leave and that she had requested accommodations upon her return. Chester Charter now moves for summary judgment. Yet Ms. Martin has produced enough facts for reasonable jurors to believe her side of the story. The Court thus denies Chester Charter's motion for summary judgment in part.

BACKGROUND

Chester Charter runs an after-school program called the 21st Century Program. Ms. Martin started as the program coordinator in 2016. She managed the day-to-day, recruiting students, ordering supplies, supervising assistants, and coordinating with the administration. She also prepared the Program's annual reports, which set out the Program's budget so the Pennsylvania Department of Education could decide how much funding to provide it.

Ms. Martin did well at her job. Her then-supervisor praised her as a "very trustworthy" and "professional" employee. Pl.'s Ex. C ¶¶ 9–10, Doc. No. 23-2. Ms. Martin made sure the students had snacks and got home on time, and she had good working relationships with the program's outside partners. She also submitted the annual reports "on time and stayed in compliance with [state] requirements and deadlines." *Id.* ¶ 20. Ms. Martin never received any discipline from her supervisors.

In August 2019, Ms. Martin spent a week in the hospital for medical conditions, including meningitis and migraines. Once discharged, she informed Chester Charter that she was going on immediate medical leave. Chester Charter cleared her to take three months' leave, from August 19 until November 8. But Chester Charter did not provide Ms. Martin with any written document listing the length of her leave or detailing her rights and responsibilities under the FMLA.

Indira Gaines, the program's assistant coordinator, took over the Program while Ms. Martin was on leave. Ms. Martin still did some work. Every two weeks, she filled out payroll. Once, she had to be available for a telephone conference to discuss a site visit from the Department of Education. Another time, she had to provide invoices for supplies she had ordered.

The annual report was due October 31, in the middle of Ms. Martin's leave. Nicole DeRitis, the elementary school director, had told the Department of Education that Chester Charter would be preparing the annual report while Ms. Martin was out. But Ms. DeRitis did not work on the

report. Nor did she instruct Ms. Gaines to work on the report. When the initial deadline passed with no report, WaTanya Ney, from the Department of Education, reached out to Ms. Martin. Though still on leave, Ms. Martin requested, and Ms. Ney granted, an extension until mid-December. Still, no one at Chester Charter started on the report.

When her leave expired on November 8, Ms. Martin did not return to work. Admitting this, Ms. Martin explains that she did not realize that her leave had expired, for the school had never given her documents with her leave dates. The next week, Akosua Watts, the head of school, emailed Ms. Martin, telling her that if she cannot return "immediately," then Chester Charter "will need to terminate [her] employment." Def.'s Ex. O, Doc. No. 22-3. Ms. Martin responded that she planned to return to work as soon as she got a note from her doctor. A week later, Ms. Watts sent another email, stating that "[i]f you are not returning to work immediately, then we regret that we will need to terminate your employment." *Id.* Ms. Martin returned to work two days later.

From the start, Ms. Martin claims, Ms. Watts and Ms. DeRitis had not been happy about her leave. Per Ms. Gaines, the program's assistant coordinator, the administrators had been "annoyed" about Ms. Martin's absence and "not happy that [her] work was not getting done while she was on leave." Pl.'s Ex. E ¶ 15, Doc. No. 23-2. On her return, Ms. Martin testified, they acted "distant" and "cold" towards her, where before they had been friendly. Doc. No. 23-1 ¶ 103.

Because she still suffered from migraines, Ms. Martin requested some accommodations. Initially, she requested that she be able to dim the lights as needed during the workday. She also informed the school that she would need time off for medical appointments. Later, Ms. Martin told the school that she "needed help" preparing the annual report. Pl.'s Ex. A at 231:20, Doc. No. 23-2. Though granting her first two requests, Ms. Watts and Ms. DeRitis explained that "they can't

really do too much [to help her with the report] because they have their jobs to do." *Id.* at 234:10–11.

Despite returning only three weeks before it was due, Ms. Martin submitted the annual report in time. The report reflected some mistakes, including typos, math errors, and missing signatures. So Ms. Ney asked her to make revisions. In previous years, Ms. Martin had also fixed similar mistakes.

Five days later, the Department told the Program to "cease operation" because the "budget ha[d] not been approved" and the Program had "outstanding invoices for the prior year." Def.'s Ex. X, Doc. No. 22-3. Surprised, Ms. Martin reached out to the Department, which said that it could take a week to review the revisions she sent to Ms. Ney. Upon reviewing Ms. Martin's initial revisions, Ms. Ney came back with another set of substantive revisions and requested more documents. That brought the Program to a standstill for several weeks.

The first day back in school after the Program was cancelled, Ms. Martin asked Ms. DeRitis to use the school's "One-Call" system, which automatically calls and emails parents, to let them know about the cancellation. Ms. Martin left early that day. She did not submit a formal request for time off but, she insists, she had told Ms. Watts that she had to leave early for a doctor's appointment. In her absence, Ms. Martin arranged for Ms. Gaines to be there in case any parents did not arrive to pick up their students. One child was left behind that day.

Two days later, Ms. Watts told Ms. Martin that she had not handled the cancellation "effectively." Def.'s Ex. AA, Doc. No. 22-3. Ms. Watts criticized her for not notifying parents of the cancellation the Friday before, and for leaving early the day of the cancellation. Ms. Martin responded that she felt "unsupported" at the school. *Id.* She had been "working diligently" despite her disabilities. *Id.* Plus, the cancellation had "blind[sided] … all [of] us as a team." *Id.*

For the next two weeks, Ms. Martin worked to correct the annual report so the Program could get back up and running. Ms. Ney continued to request substantive revisions, and Ms. Martin attempted to make them. The Department of Education then met with Ms. Martin, Ms. DeRitis, and Ms. Watts to discuss issues with the report and the Program. The night before, Ms. Watts rewrote much of the report. Immediately after the meeting, the Department approved the budget, thus reinstating the Program. The next day, Chester Charter fired Ms. Martin.

## LEGAL STANDARDS

To grant summary judgment, the Court must find that (1) "there is no genuine issue as to any material fact" and (2) Chester Charter "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To be material, a fact must have the potential to "affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And for a factual dispute to be genuine, the evidence must be such that a reasonable jury could decide for either side on that issue. *Id.*

As the movant, Chester Charter bears the initial burden to show that either Ms. Martin has failed to produce evidence for "an essential element of her case [for] which she has the burden of proof" or that, even if she has produced evidence, no reasonable juror could rule for her. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). All factual inferences are drawn in Ms. Martin's favor. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Because issues of credibility and intent abound in employment discrimination cases, the Court should be hesitant to grant summary judgment. *See Marzano v. Comput. Sci. Corp.*, 91 F.3d 497, 509–10 (3d Cir. 1996). Faced with competing stories, the Court must not "[it]self ... weigh the evidence and determine the truth of the matter" but instead must leave it to the jury to resolve "the parties' differing versions" of what really happened. *Anderson*, 477 U.S. at 249; *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968).

DISCUSSION

The Americans with Disabilities Act forbids discrimination "on the basis of disability." 42 U.S.C. § 12112(a). Likewise, the Pennsylvania Human Relations Act forbids discrimination "because of" a disability. 43 Pa. Stat. § 955(a). The Family Medical Leave Act gives an employee three-months' unpaid leave to recover from "a serious health condition." 29 U.S.C. § 2612(a)(1)(D), (c).

Resting on these three statutes, Ms. Martin asserts five claims of employment discrimination: First, Chester Charter fired her because she is disabled. Second, Chester Charter retaliated against her because she used reasonable accommodations for her disabilities. Third, Chester Charter retaliated against her for taking FMLA leave. Fourth, upon her return from leave, Chester Charter created a hostile work environment. And fifth, Chester Charter interfered with her leave and discouraged her from taking leave in the future.[1] Insisting that it did not discriminate, Chester Charter moves for summary judgment on all five claims.

**I.      Reasonable jurors could find that Chester Charter discriminated against Ms. Martin based on her disability**

Under the American with Disabilities Act, an employer cannot "discriminate against a qualified individual on the basis of a disability" in the "terms, conditions, and privileges of employment," including "discharge." 42 U.S.C § 12112(a). Ms. Martin asserts that Chester Charter did just that. Because she relies on indirect evidence of discrimination, *McDonnell Douglas*'s burden-shifting framework applies. That means that Ms. Martin must first make out a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Chester Charter then bears the burden of articulating a nondiscriminatory reason for its decision to fire her.

---

[1] Originally, Ms. Martin also objected that Chester Charter did not provide more accommodations for her disability. She has since withdrawn her failure-to-accommodate claim. Doc. 23, at 2 n.1.

*Id.* If it does so, the burden shifts back to Ms. Martin, who must prove that Chester Charter's reason is pretextual. *Id.* at 804.

### A. Ms. Martin has made out a prima facie case

To make out her prima facie case, Ms. Martin must show that (1) she has a disability; (2) she is "qualified" for the job; and (3) she lost her job "because of" that disability. *Deane v. Pocono Med. Ctr.*, 142 F.3d 138, 142 (3d Cir. 1998). Chester Charter does not contest that Ms. Martin has a disability. Her severe migraines "substantially limit" her ability to walk, sleep, see, and work. 42 U.S.C § 12102(1)(A), (2)(A). But Chester Charter does contest the other two prongs.

### i.     Reasonable jurors could find that Ms. Martin was qualified for her job

To start, Chester Charter contends that Ms. Martin was not qualified to do her job. Though admitting that Ms. Martin met all the job requirements when she was hired, it claims she no longer does because she could not submit the most recent annual report on time, an "essential" function of her job. 42 U.S.C § 12111(8).

Ms. Martin does not contest that the annual report was "essential" to her position. Instead, she asserts that she could complete the report, and all the rest of the position's essential functions. She "had the objective experience and education necessary" for the job; she had a bachelor's degree in business administration and had worked in education for years. *Sempier v. Johnson & Higgins*, 45 F.3d 724, 729 (3d Cir. 1995). Plus, Ms. Martin had successfully submitted the report in years past. True, most times she had been required to make revisions. But, as Ms. Ney explained, other schools have to make similar corrections "about 75 percent of the time." Pl.'s Ex. LL 15:20–16:4, Doc. No. 23-5. And once Ms. Martin made those corrections, the Department granted funding for the Program. Ms. Martin's failure to get an accurate report in this time, by itself, does

not prove that she could not do so. The ADA asks whether individual "*can* perform the essential functions," not whether she did this one time. 42 U.S.C § 12111(8) (emphasis added).

Besides, as Ms. Martin points out, she counts as qualified if she can perform the job "with reasonable accommodation[s]." 42 U.S.C § 12111(8). On several occasions, Ms. Martin asked for help preparing the report. Though the report had been due during Ms. Martin's leave, Chester Charter did not start on it. Upon her return, Ms. Martin had a condensed timeline to finish the report, and to perform the revisions typically requested by the Department. So, she asserts, some help would have been reasonable.

Chester Charter discounts her request by asserting that she has not explained exactly what help she needed. Certainly, Ms. Martin did not set out a checklist of specific action items for others to help her with. *See* Pl.'s Ex. A at 234:17–21 ("Q: What help did you request specifically? A: I just needed help to get the report completed so we can get the program operating again."). But she did explain that she sought "a second set of eyes," someone who could help her proofread for "clerical errors." *Id.* at 235:23–236:3.

To Chester Charter, this is not a reasonable accommodation; it is Ms. Martin attempting to "give the responsibility of completing [an essential task] to someone else." Doc. No. 22-2, at 10. But Ms. Martin's request for help with the report could have been a reasonable accommodation. Indeed, the ADA lists "job restructuring" as a potential reasonable accommodation. 42 U.S.C. § 12111(9)(B). Chester Charter has not suggested that providing help with the report would have "impose[d] undue financial and administrative burdens" on the school or "require[d] a fundamental alternation in the nature of the program," *School Bd. of Nassau Cnty., Fla. v. Arline*, 480 U.S. 273, 287 n.17 (1987) (internal quotation marks omitted).

Because Ms. Martin has pointed to evidence from which reasonable jurors could find that she could perform her job, with or without reasonable accommodations, there is a material dispute of fact whether Ms. Martin was "qualified" for her position as program coordinator.

**ii.    Ms. Martin has made an initial showing that she was fired because of her disabilities**

For her initial showing that Chester Charter fired her "on the basis of" her disability, Ms. Martin points to the timing: she was fired within six months of disclosing her disability and two months of her return to work. This timing, though suspicious, is not "unduly suggestive." *Williams v. Phila. Hous. Auth. Pol. Dep't*, 380 F.3d 751, 761 (3d Cir. 2004); *compare id.* at 760–61 ("over two months" between requesting accommodation and termination not enough to show causation) with *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989) (two days between complaint and discharge enough to infer causation).

Recognizing this, Ms. Martin paints a "pattern of antagonism" once she told the school she had a disability. *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997). Chester Charter contacted her and asked her to do work while on leave. Meanwhile, it did not take appropriate steps to fill in for her and then later criticized her for the work that did not get done. Once she returned, Chester Charter did not engage in "meaningful ... discussion" about how it could accommodate Ms. Martin; instead, she says, it expected her to jump right back in. Doc. No. 23, at 14.

Plus, Ms. Martin explains, her supervisors began to "treat[ ] [her] differently." Pl.'s Ex. A, at 172:22–23. Before her leave, Ms. DeRitis had been "friendly" to her. *Id.* at 298:11–17. Upon her return, Ms. DeRitis, and Ms. Watts, acted "cold" towards her and "made [her] feel uncomfortable." *Id.* at 172:22, 173:13–15. For example, Ms. DeRitis often gave Ms. Martin "one-word answers" to her questions. *Id.* at 298:8–9; *cf. Robinson v. Se. Pa. Transp. Auth.*, 982 F.2d

892, 895 (3d Cir. 1993) (sufficient causation where employee's "relationship with his supervisors deteriorated sharply" after he complained of racial bias).

Bolstering Ms. Martin's testimony, Ms. Gaines, the program assistant, also said that Ms. Watts and Ms. DeRitis had been "annoyed" that Ms. Martin had taken leave. Pl.'s Ex. E ¶ 15. Further, Ms. Watts admitted that she had told Ms. Martin that "her priorities were off" after her return. Pl.'s Ex. D at 124:5–125:2.

Pairing her supervisors' behavior and comments with the timing, Ms. Martin has gathered enough evidence "to raise the inference that her" disability and leave were "the likely reason[s] for" her firing. *Kachmar*, 109 F.3d at 177.

### B. Chester Charter has laid out a nondiscriminatory reason for her firing

The burden thus shifts to Chester Charter. Chester Charter asserts a legitimate, nondiscriminatory basis for firing Ms. Martin: she did not do her job correctly, causing the program to shut down. For support, Chester Charter details Ms. Martin's mistakes. Each year, she received detailed instructions on how to submit the annual report, yet she always had to submit corrections. That year, she had to submit multiple sets of corrections. Her mistakes, Chester Charter asserts, had serious consequences. The Program shut down for several weeks. And the school got $72,000 less because it had not spent its full budget the year before. *Cf. Keller v. Orix Credit All., Inc.,* 130 F.3d 1101, 1109 (3d Cir. 1997) (en banc) (employer had "a particularly powerful reason" for firing where employee "fail[ed] to meet or even approach" one of his job's main objectives).

### C. Ms. Martin has shown that reason might be pretext

The burden thus shifts back to Ms. Martin, to prove that Chester Charter's explanation is mere pretext and that, "but for" her disability, leave, and request for accommodations, she would not have been fired. *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).

Ms. Martin asserts that she performed her job well, pointing to praise from supervisors and inferiors from prior years and the raise she got each year. Chester Charter counters that she focuses on the wrong time frame: no matter how good her performance was before leave, she failed to do her job once she returned.

Yet Chester Charter had never criticized her performance before, even though she had made similar mistakes in preparing the report. Given that Chester Charter had "tacitly accepted" her earlier mistakes, a jury might "suspect" the bona fides of its current "assertions of poor performance." *Brewer v. Quaker State Oil Refin. Corp.*, 72 F.3d 326, 332 (3d Cir. 1995); *Sempier v. Johnson & Higgins*, 45 F.3d 724, 731 (3d Cir. 1995). Bolstering this, Ms. Martin says that her supervisors started "nitpicking about everything." Pl.'s Ex. A at 299:1–2. Reasonable jurors could find that Chester Charter started to scrutinize Ms. Martin's work *because* she took leave and sought accommodations upon her return. *See Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1074 (3d Cir. 1996) (sufficient showing of pretext where the employer said he would "watch [employee] like a hawk" and then later came up with a long list of complaints about her performance) (internal quotation marks omitted).

Chester Charter insists it had good cause for its new criticism: Ms. Martin's mistakes had never shut down the Program before. But Ms. Martin insists that the shutdown was not her fault. Chester Charter could have completed the report in her absence, and perhaps should have, given that the report was originally due during Ms. Martin's leave. Yet Chester Charter did not even *start* on the report. Later, Ms. Martin asked for help on the report, but got none. When the Program was shut down because the report did not get done in time, Chester Charter punished Ms. Martin alone. Reasonable jurors could see this as discriminatory scapegoating. *Cf. Martinelli v. Penn Millers Ins. Co.*, No. 3-02-cv-2292, 2005 WL 2100695, at *8 (M.D. Pa. Aug. 29, 2005) (evidence of

11

pretext where nobody at company caught problem in client account yet "the blame was assigned to [the plaintiff] shortly after she raised a claim of pay discrimination").

Further, when the Program shut down, the school *immediately* fired Ms. Martin. Per Ms. Martin, this was not the norm. She claims that Chester Charter had an informal "progressive discipline policy," where the school escalated from a verbal warning to a written one to "some kind of plan" before firing the employee. Pl.'s Ex. A at 288:23–289:6. For support, she points to her own understanding of school policies, plus an affidavit from a prior Chester Charter principal. In response, Ms. Watts asserts that no such policy existed. This is a genuine dispute of material fact: the jury must decide whose testimony to believe. If Chester Charter did have an informal progressive discipline policy, then the school skipping straight to termination, rather than following its policy, could suggest discriminatory intent. *See Craig v. Y & Y Snacks, Inc.*, 721 F.2d 77, 80 (3d Cir. 1983).

Just as "[a] play cannot be understood on the basis of some of its scenes but only its entire performance, ... a discrimination analysis must concentrate not on individual incidents, but on the overall scenario." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1484 (3d Cir. 1990). Ms. Martin has pointed to sufficient evidence from which a reasonable jury could infer that Chester Charter fired her because of her disability. The Court thus denies summary judgment on this disability-discrimination claim.

## II.   Reasonable jurors could find that Chester Charter retaliated against Ms. Martin

Next, Ms. Martin claims that Chester Charter retaliated against her for taking leave and for requesting accommodations on her return. Both the ADA and the FMLA prohibit retaliation. 42 U.S.C. § 12203(a); 29 U.S.C. § 2615(a). To prove retaliation, Ms. Martin must show that (1) she took part in protected activities, (2) Chester Charter took adverse employment action against her,

and (3) Chester Charter did so because of her protected activities. *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 (3d Cir. 2000).

Ms. Martin took three-months' FMLA leave. 29 C.F.R. § 825.220(c). She also requested accommodations upon her return, including time off for doctor's appointments and an additional month of unpaid medical leave once her FMLA leave expired. *See* 29 C.F.R. pt. 1630, app. (EEOC guidance that reasonable accommodations could include "providing additional unpaid leave for necessary treatment").

Not contesting that these count as protected activities, Chester Charter instead denies that Ms. Martin engaged in a protected activity on January 21, 2020, when she left early the day the program shut down. Ms. Martin insists she was at a doctor's appointment (though she cannot remember which doctor). Per Chester Charter, her medical records show that she had finished her migraine treatments the day before. If Ms. Martin was not at a doctor's appointment that afternoon, Chester Charter reasons, her firing could not be retaliation for a protected activity. Yet that fact is disputed. And even if Chester Charter did win that factual dispute, the victory would not help much. Ms. Martin claims that Chester Charter also retaliated against her for the other accommodations she requested, not just this one doctor's appointment.

For causation under the ADA, Ms. Martin must show that Chester Charter would not have fired her "but for" the accommodations she requested. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013); *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997). To prove retaliation under the FMLA, she needs to show that her firing "was motivated at least in part by [her] use of FMLA leave." *Egan v. Del. River Port Auth.*, 851 F.3d 263, 272 (3d Cir. 2017).

Like with her discrimination claim, Ms. Martin starts with timing. She was fired within two months of returning from leave and two months of requesting additional accommodations.

This timing is suggestive. *See Fasold v. Justice*, 409 F.3d 178, 189–90 (3d Cir. 2005) (three months enough for "temporal proximity" between employee's complaint and employer's decision). To bolster her claim, Ms. Martin reiterates that her supervisors became antagonistic towards her. Their "demeanor toward her changed dramatically" once she returned from leave. *Abramson v. William Paterson Coll. of N. J.*, 260 F.3d 265, 270 (3d Cir. 2001). Before, they had been friendly, but now they were "cold." Plus, they were "annoyed" she had taken leave, and said that her "priorities were off." This "irritation," combined with the two-month gap, is enough for reasonable jurors to find that Chester Charter had retaliated against Ms. Martin for taking leave and requesting accommodations. *Fasold*, 409 F.3d at 190; *cf. Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 189 (3d Cir. 2003) (prima facie showing of causation where 10 days passed between complaint and firing and employer noted that employee had chosen "the legal route").

### III.   No reasonable juror could find that Chester Charter subjected Ms. Martin to a hostile work environment

Ms. Martin also asserts that, upon her return from leave, she experienced a hostile work environment. For this claim, Ms. Martin must show that (1) she experienced unwanted harassment as a result of her disability, (2) the harassment was "sufficiently severe or pervasive to alter the conditions of her employment," and (3) Chester Charter knew or should have known of the harassment but failed to act. *Walton v. Mental Health Ass'n of Se. Pa.*, 168 F.3d 661, 667 (3d Cir. 1999).

To Ms. Martin, Ms. Watts and Ms. DeRitis made her feel "unsupported" at work because they were "cold" towards her. Doc. No. 23, at 36. Yet that does not count as *severe* or *pervasive* harassment. Her supervisors did not "physically threaten[ ] or humiliat[e]" her. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). Nor did they "intimidat[e], ridicule, [or] insult" her. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986). Being uncomfortable at work is not at all the

same as having an "abusive working environment." *Harris*, 510 U.S. at 21. The Court thus grants Chester Charter summary judgment on this claim.

### IV.   No reasonable juror could find that Ms. Martin was prejudiced by any interference with her leave

Under the FMLA, an employer may not "interfere with, restrain, or deny the exercise of" an employee's right to take medical leave. 29 U.S.C. § 2615(a)(1). Chester Charter promptly provided Ms. Martin her full leave and then reinstated her to her full position upon her return. Still, Ms. Martin insists, that is not enough, for its actions during her leave prevented her from having a meaningful leave and "chill[ed] [her] desire to take FMLA leave" in the future. Doc. No. 23, at 31.

"Some district courts in this Circuit have suggested that an employee may bring an interference claim for actions which could 'chill' desire to take FMLA leave, even when the employee takes the leave." *Sherrod v. Phila. Gas Works*, 57 F. App'x 68, 73 n.6 (3d Cir. 2003). Plainly read, the FMLA's text contemplates such actions. The FMLA prohibits "deny[ing]" the right to leave and "interfer[ing] with" or "restrain[ing]" that right. 29 U.S.C. § 2615(a)(1). Employers "interfere" with employees' rights when they "meddle with" leave now or present "opposition" "so as to affect the course of" leave in the future. *Interfere* (defs. 4(a)–(b)), *Oxford English Dictionary* (2d ed. 1989). Confirming this, the Department of Labor's regulations explain that an employer must not "discourag[e] an employee from using [her] leave," either now or in the future. 29 C.F.R. § 825.220(b).

To show that Chester Charter interfered with her leave, Ms. Martin gestures to the bad experience she had. Chester Charter failed to inform her of her FMLA rights or even tell her the date her leave would expire. It pressured her to perform work during leave and then blamed her when the report did not get done in time. Once her leave expired, it threatened to terminate her

"immediately" if she did not return. Upon her return, her supervisors "treated her in a cold, rude, distant and unsupportive manner." Doc. No. 23, at 31. With such a bad experience, Ms. Martin suggests, she will be hesitant to request FMLA leave going forward.

Even if Chester Charter's conduct could technically amount to interference with Ms. Martin's leave, no reasonable juror could find that she was harmed from it. An interference claim requires prejudice, a showing of actual harm from the employee being denied meaningful leave. *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002). After all, the FMLA provides for actual damages, not statutory ones. *See* 29 U.S.C. § 2617(a).

Yet Ms. Martin has not even attempted to show prejudice. She has not explained how her leave would have been different had Chester Charter provided her the proper documents. Nor has she said, much less proved, that she would have recovered faster had she not had to do occasional work. *See Ragsdale*, 535 U.S. at 90. At most, she has guessed that she will need to take more leave next year but be hesitant to do so. Such speculation is far too attenuated. The FMLA cares about "real impairment" of an employee's right to leave, not theoretical impairment. *Id.* at 90. Because Ms. Martin has not articulated any actual prejudice, the Court grants Chester Charter summary judgment on this claim.

### CONCLUSION

Chester Charter insists it had good cause to fire Ms. Martin. But Ms. Martin has pointed to enough evidence from which a reasonable juror could find that Chester Charter would not have fired her but for her leave and disability. Thus, the Court denies Chester Charter's motion for summary judgment on her discrimination and retaliation claims. The Court does, however, grant

Chester Charter summary judgment on Ms. Martin's hostile-work-environment and interference claims. An appropriate order follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE